## SOUTHERN PAC. R. CO. v. ARAIZA.

(Circuit Court, S. D. California. July 24, 1893.)

### No. 181.

1. PUBLIC LANDS—SOUTHERN PACIFIC GRANT — INDEMNITY LANDS—HOMESTEAD ENTRY.
    Under Act July 27, 1866, (14 Stat. 292,) granting lands to the Southern Pacific Railway Company, public land without the primary limits, but within the indemnity limits of the grant, was not open for homestead entry after an order was issued from the general land office directing the withdrawal of such lands from entry. Buttz v. Railroad Co., 7 Sup. Ct. Rep. 100, 119 U. S. 72, followed. Railroad Co. v. Tilley, 41 Fed. Rep. 729, overruled.

2. SAME—REMEDY AGAINST HOMESTEADER.
    A homesteader who has made such an entry and received a patent therefor against the opposition of the Southern Pacific Railway Company is subject to have his title decreed to be held in trust for said company, when it appears that the lands within the indemnity limits will not make up to the company the loss of lands within the primary limits.

In Equity. Bill by the Southern Pacific Railroad Company against Juana C. Araiza to recover lands wrongfully patented to respondent. Heard on demurrer to bill. Demurrer overruled.

Joseph D. Redding and Creed Haymond, for plaintiff.
Del Valle & Munday and J. H. Call, for defendant.

ROSS, District Judge. The land in controversy in this suit having been entered by the defendant, Araiza, as a homestead, and a patent therefor having been issued to her by the government, the complainant seeks to obtain a decree that the title thus conveyed is held in trust for it. The source of the complainant's alleged right rests in a congressional grant. Section 23 of the act approved March 3, 1871, (16 Stat. 579,) reads:

"That for the purpose of connecting the Texas Pacific Railroad with the city of San Francisco, the Southern Pacific Railroad Company of California is hereby authorized, subject to the laws of California, to construct a line of railroad from a point at or near Tehachapai pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, with the same rights, grants, and privileges, and subject to the same limitations, restrictions, and conditions, as were granted to said Southern Pacific Railroad Company of California by the act of July twenty-seven, eighteen hundred and sixty-six: provided, however, that this section shall in no way affect or impair the rights, present or prospective, of the Atlantic & Pacific Railroad Company, or any other railroad company."

By the act of July 27, 1866, (14 Stat. 292,) the Southern Pacific Railroad Company was authorized to connect with the Atlantic & Pacific Railroad at such point near the boundary line of the state of California as they should deem most suitable for a railroad line to San Francisco, and, subject to certain conditions, exceptions, and limitations, was granted every alternate section of public land, not mineral, designated by odd numbers, to the amount of 10 alternate sections per mile on each side of said road, to which the United States should have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time such road should be designated by a plat thereof filed in the office of the commissioner of the general land office; and where, prior to said time, any of said sections or parts of sections should be granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of, the act provided that other lands should "be selected by said company in lieu thereof, under the direction of the secretary of the interior, in alternate sections, and designated by odd numbers, not more than 10 miles beyond the limits of said alternate sections, and not including the reserved numbers." The exceptions contained in the act are not applicable to the present case, and need not, therefore, be referred to.

By the sixth section of the act of July 27, 1866, it was enacted—

"That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road, after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption, before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting pre-emption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same

are hereby, extended to all other lands on the said line of said road when surveyed, excepting those hereby granted to said company."

The bill, to which a demurrer is interposed, shows upon its face that the Southern Pacific Company accepted the grant, complied with the conditions contained in it, and in subsequent acts upon the subject, and earned the granted lands. It is, among other things, alleged that between the 3d day of March, 1871, and the 3d day of April, 1871, its engineers actually surveyed and marked upon the ground the line or route of its road from a point at or near Tehachapai pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river; that they made a topographical map of the country through which the route ran, on which the government surveys and the said line or route were delineated, so that its exact location appeared thereon, with reference, as well to the sections of public lands as to the towns, counties, and rivers in said region, which map was, on the 3d day of April, 1871, filed with the secretary of the interior, who duly accepted the same, and who, on the same day, transmitted the map to the commissioner of the general land office, to be filed in that office, which was done on that day; that on the 11th day of April, 1871, the action of its officers in filing the map was ratified and approved by the board of directors of complainant; and that on the 21st of April, 1871, the commissioner of the general land office transmitted a copy of the map to the register and receiver of the land office at Los Angeles, in which district the land in controversy is situate, and on the same day, by order of the secretary of the interior, the commissioner addressed to the register and receiver of the Los Angeles land office the following letter:

"Department of the Interior.
"General Land Office, April 21, 1871.

"Register and Receiver, Los Angeles, California—Gentlemen: By the act of March 3, 1871, section 23, the Southern Pacific Railroad Company is authorized to construct a railroad from a point at or near Tehachapai pass, by way of Los Angeles, to the Texas Pacific Railroad, at or near the Colorado river, with the same grant of lands, etc., as were granted to said company by act of July 27, 1866. The company having filed a diagram designating the general route of said road, I hereby transmit a map showing thereon the line of route, as also the twenty and thirty mile limits of the grant, to the line of withdrawal of the Southern Pacific Railroad under the act of 1866; and you are hereby directed to withhold from sale, or location, pre-emption, or homestead entry, all the odd-numbered sections falling within those limits. The even-numbered sections within the limits of twenty miles you will increase in price to $2.50 per acre, and will dispose of them at that price, but only under the pre-emption and homestead laws. When pre-emption or homestead entries have had legal inception prior to the receipt of this order, the settlers may, of course, prove their claims, either upon odd or even-numbered sections, at the rate of $1.25 per acre. This order will take effect from the date of its receipt by you, and you will please acknowledge receipt by date. The even-numbered sections between the twenty and thirty mile or indemnity limits are not affected by this order.

"Very respectfully,          Willis Drummond, Commissioner."

The bill alleges that this order of withdrawal has ever since remained in force. It alleges that the land in controversy in the

suit is more than 20, but within 30, miles of the said railroad, and that it had not been granted, sold, reserved, occupied by homestead settlers, or pre-empted, or otherwise disposed of by the United States for any purpose at the time the line of the complainant's road was definitely fixed, and that the United States then had full title thereto. It is alleged that the entire indemnity limits fixed in the grant are insufficient to supply the loss sustained by complainant within the granted limits, and that the commissioner of the general land office, in his annual report for the year 1883 to the interior department and to the president of the United States, "attested and certified to the fact that the land within the indemnity limits, under said act of March 3, 1871, will by no means supply the loss of lands within the twenty-mile limits to said railroad company under said act." It is alleged that on or about the 24th day of June, 1877, the defendant entered upon the tract of land in controversy, and that subsequently she was permitted to enter the land as a homestead, and that on the 9th day of July, 1889, a patent therefor was issued to her by the land department. The bill alleges that every step in the land department culminating in the issuance of this patent was contested by the complainant; that when the president approved the construction of the section of the Southern Pacific Railroad opposite the land in controversy,—that is to say, on or about the 25th day of May, 1883, —complainant embraced the land in question in its indemnity list No. 5, and tendered to the officers of the local land office all proper fees for selecting and listing the land, and securing the patent therefor, but that the officers of the land department refused to approve the selection; the reason, doubtless, being that the defendant, Araiza, had theretofore been permitted to enter the land as a homestead, upon which entry a patent had been issued.

From this statement of the averments of the bill it will be seen that at the time the line of complainant's road was definitely fixed the land in controversy, which was without the primary, but within the indemnity, limits of the grant, was public land, to which the United States had full title, and that at the time the defendant first went upon the land the order withdrawing it from sale, preemption, or homestead entry was in force; and, further, that at the time of the defendant's entry upon the land, and at the time it was awarded to her by the officers of the land department, there had been no attempt on complainant's part to select it in lieu of any land lost to it within the primary limits of the grant, or at all, although complainant had contested defendant's entry in the land department.

The question involved has twice before arisen in this circuit,— once in this district, in the case of Railroad Co. v. Tilley, reported in 41 Fed. Rep. 729, and subsequently in the northern district of California, in the case of Railroad Co. v. Wiggs, 43 Fed. Rep. 333, in which the circuit judge reached a different conclusion from that announced in the previous case decided here, without, however, making mention of it. Indeed, it is evident that the learned judge

who decided that case did not at the time know of the decision here, for in his opinion it is stated that, so far as he is aware, the precise question involved was not presented in any other case. 43 Fed. Rep. 335. Neither party appealed from either decision, so that the unfortunate difference of opinion then existing in the circuit was not settled by the supreme court. But the question has again come, and has been again considered.

The act of July 27, 1866, did not direct the secretary of the interior to make any order withdrawing the lands that might fall within the grant from sale, pre-emption, homestead entry, or other disposition. Such an order, however, was made in the present case, as well as in Tilley's; and this court, in referring to that order in the case of Railroad Co. v. Tilley, supra, said:

"It is true the order of withdrawal made by the secretary on the 27th of March, 1867, had not been in terms vacated, but the secretary had the same power to vacate it that he had to make it; and when he permitted Tilley to make his entry, and awarded the land in question to him, and issued him a patent therefor, he, in effect, annulled the order of withdrawal so far as that particular piece of land was concerned. In doing so he violated no vested right of the complainant, for to that land the company had not then acquired any right of any nature. It had not selected it, and might never do so. There was, therefore, no legal reason why he should not allow the homestead entry. The act making the grant to the complainant did not direct the secretary of the interior to make any order withdrawing the lands that might fall within it from sale, pre-emption, homestead entry, or other disposition, and did not prescribe the effect to be given to such an order. It is not for the court to say whether the secretary ought or ought not to have allowed the homestead entry while the general order of withdrawal remained unrevoked. It is sufficient for the purposes of this suit to say that in doing so he did not interfere with any legal right of complainant, for the simple reason that complainant had not then acquired any right to the land in controversy in the only mode it could acquire it, namely, by selecting it."

In so holding the court had in mind the numerous decisions of the supreme court to the effect that railroad companies acquire, under grants in aid of their construction, no right of any nature to any specific tract of land embraced within the indemnity limits prior to selection, and also to the language of the supreme court in the case of St. Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 732, 5 Sup. Ct. Rep. 334, in respect to the effect of an order of the land department withdrawing lands embraced within the secondary or indemnity limits from market. The court there said:

"It is true that in some cases the statute requires the land department to withdraw the lands within these secondary limits from market, and in others the officers do so voluntarily. This, however, is to give the company a reasonable time to ascertain their deficiencies and make their selections. It by no means implies a vested right in said company, inconsistent with the right of the government to sell, or of any other company to select, which has the same right of selection within those limits."

In the subsequent case of Buttz v. Railroad Co., 119 U. S. 72, 7 Sup. Ct. Rep. 100, the supreme court, in speaking of a similar order of withdrawal, said:

"Although the act [then under consideration, namely, the act making a grant to the Northern Pacific Railroad Company] does not require the officers of the land department to give notice to the local land officers of the withdrawal of the odd sections from sale or pre-emption, it has been the

practice of the department in such cases to formally withdraw them. It cannot be otherwise than the exercise of a wise precaution by the department to give such information to the local land officers as may serve to guide aright those seeking settlements on the public lands, and thus prevent settlements and expenditures connected with them which would afterwards prove to be useless."

And in the still later case of St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 18, 11 Sup. Ct. Rep. 389, the supreme court, after quoting from the case of Buttz v. Railroad Co., as above, added:

"After such withdrawal, no interest in the lands granted can be acquired against the rights of the company, except by special legislative declaration, nor, indeed, in the absence of its announcement, after the general route is fixed."

This is the latest expression of the supreme court upon that point to which my attention has been called, was subsequent to the decision in Tilley's Case, and is, of course, binding on this court.

An order of withdrawal made before the line of road is definitely fixed is as applicable to lands within the indemnity limit as to those within the primary limits of the grant; for up to that time the grant is no more attached to specific tracts of the one class of lands than of the other, neither being in any way identified.

The sixth section of the act of July 2, 1864, (13 Stat. 365,) making the grant to the Northern Pacific Railroad Company, is substantially the same as the sixth section of the act of July 27, 1866, involved in the present case. It reads:

"That the president of the United States shall cause the lands to be surveyed for forty miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and the odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act; but the provisions of the act of September, eighteen hundred and forty-one, granting preemption rights, and the acts amendatory thereof, and of the act entitled 'An act to secure homesteads to actual settlers on the public domain,' approved May twenty, eighteen hundred and sixty-two, shall be, and the same are hereby, extended to all other lands on the line of said road when surveyed, excepting those hereby granted to said company, and the reserved alternate sections shall not be sold by the government at a price less than two dollars and fifty cents per acre when offered for sale."

In Buttz v. Railroad Co., supra, the court said:

"The general route may be considered as fixed when its general course and direction are determined after an actual examination of the country, or from a knowledge of it, and is designated by a line on a map showing the general features of the adjacent country, and the places through or by which it will pass. The officers of the land department are expected to exercise supervision over the matter, so as to require good faith on the part of the company in designating the general route, and not to accept an arbitrary and capricious selection of the line, irrespective of the character of the country through which the road is to be constructed. When the general route of the road is thus fixed in good faith, and information thereof given to the land department by filing a map thereof with the commissioner of the general land office or the secretary of the interior, the law withdraws from sale or pre-empt'on the odd sections to the extent of forty miles on each side. The object of the law in this particular is plain,—it is to preserve the land for the company to which, in aid of the construction of the road, it is granted."

The language of the sixth section of the two acts being in substance, and almost literally, the same, the language of the supreme court above quoted is equally applicable to the act in question here. If, as there held, the law itself withdraws from sale or pre-emption the odd sections to the extent of 40 miles on each side of the road represented by the map of general route, manifestly it withdraws from sale or pre-emption the odd sections within the limits named in the grant on each side of the line of road as fixed by the map of definite location. Such being the true construction of the statute itself, as thus declared by the supreme court, it would seem to result necessarily that all of the odd sections within the indemnity, as well as the primary, limits of the grant contained in the act of July 27, 1866, were withdrawn from sale or pre-emption, without regard to the order of withdrawal promulgated by the secretary of the interior, through the commissioner of the general land office, and consequently they were not open to entry or settlement at the time of the defendant's entry and settlement thereon; for, as has been seen, the court declares that the law itself worked that result. "The object of the law," said the court, "in this particular, is plain,— it is to preserve the land for the company to which, in aid of the construction of the road, it is granted. Although the act does not require the officers of the land department to give notice to the local land office of the withdrawal of the odd sections from sale or pre-emption, it has been the practice of the department in such cases to formally withdraw them. It cannot be otherwise than the exercise of a wise precaution by the department to give such information to the local land officers as may serve to guide aright those seeking a settlement on the public lands, and thus prevent a settlement and expenditures connected with them which would afterwards prove to be useless." This decision was quoted with approval in the very recent case of U. S. v. Southern Pac. R. Co., 146 U. S. 599, 600, 13 Sup. Ct. Rep. 152.

For the reasons given, the demurrer is overruled, with leave to the defendant to answer within the usual time.